IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:20-CV-516-FL

| | | |
|---|---|---|
| NOVAQUEST CAPITAL | ) | |
| MANAGEMENT, L.L.C. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER |
| v. | ) | |
| | ) | |
| MATTHEW BULLARD, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on plaintiff's motion for preliminary injunction (DE 15). Issues raised are ripe for ruling. For the following reasons, plaintiff's motion is granted in part and denied in part as set forth herein.

## STATEMENT OF THE CASE

Plaintiff commenced this breach of contract action in Wake County Superior court on September 29, 2020, asserting that its former employee, defendant, breached a covenant not to compete ("covenant") contained in an executive employment agreement ("employment agreement") and separation agreement ("separation agreement") between the parties. Plaintiff seeks temporary, preliminary, and permanent injunction,[1] preventing defendant from working at HealthCare Royalty Partners ("HealthCare"), an entity that currently employs defendant, or from performing any other activities that compete with plaintiff, until May 27, 2021. Plaintiff also seeks

---

[1] Plaintiff also includes in a portion of its complaint a motion for temporary restraining order ("TRO") and motion for preliminary injunction. As set forth herein, the court required plaintiff to file the instant motion for preliminary injunction as a separate document, in accordance with the rules of this court.

damages in the form of: 1) all actual, compensatory, and punitive damages, with interest; 2) restitution of post-employment compensation paid to defendant under the separation agreement; 3) the amount of any commission or fee that defendant earned through work for HealthCare; and 4) litigation costs and expenses.

Defendant removed the action to this court based upon diversity jurisdiction, on October 2, 2020.[2] That same date, the court noticed telephonic conference pursuant to Federal Rule of Civil Procedure 16 for the purpose of establishing a schedule for expedited address of injunctive issues. At conference held October 9, 2020, the court directed expedited filing of motion and briefing in accordance with the court's rules regarding plaintiff's request for preliminary injunctive relief.

Plaintiff filed the instant motion on October 14, 2020, seeking a preliminary injunction providing the following relief:

1) Enjoining defendant from violating his contractual obligations owing to plaintiff in the covenant;

2) Enjoining defendant, and all others acting in concert with him, from allowing defendant "to be employed by, affiliated with or perform any business activities on behalf of [HealthCare], or any of its parents, subsidiaries or affiliates, through the expiration of this litigation";

3) Enjoining defendant from disclosing or using any of plaintiff's trade secrets or confidential information to further his own business interests or the business interests of any third party, including HealthCare.

---

[2] Prior to removal, plaintiff noticed hearing in state court on October 5, 2020, on the TRO motion embedded within its complaint.

2

(Motion (DE 15) at 2-3). Plaintiff relies upon a memorandum in support and declaration of Jacob Comer ("Comer"), plaintiff's general counsel and chief compliance officer, who makes reference to: the employment and separation agreements; selected pages from HealthCare's website concerning defendant and HealthCare; and a cease and desist letter issued by counsel for plaintiff to defendant.

In its opposition materials, filed October 21, 2020, defendant relies upon his own declaration and plaintiff's objections and responses to defendant's expedited first set of interrogatories. In reply filed October 23, 2020, plaintiff relies upon a second declaration by Comer.

## STATEMENT OF THE FACTS

The court finds the following facts pertinent to the instant motion.

Plaintiff is a "private investment firm that focuses on the biopharmaceutical, life sciences, and healthcare sectors." (Comer Decl. (DE 17) ¶ 3). "Through structured finance and other strategic investments, [plaintiff] promotes the development and growth of biopharmaceutical products and life sciences technologies." (Id. ¶ 4). "While based in Raleigh, North Carolina, [plaintiff] operates in a highly competitive global marketplace and has evaluated and/or engaged in transactions in furtherance of its business in California, Massachusetts, New York, New Jersey, North Carolina, the United Kingdom, France, Germany, Switzerland, Italy, the Netherlands, Spain, Japan, Korea, China, India, and Australia, among other locations." (Id. ¶ 5).

Defendant commenced employment with plaintiff in November 2010 "in the role of Principal," and defendant also "worked for several years before that time for [plaintiff's] predecessor, an internal business unit of Quintiles Transnational, a contract research organization." (Id. ¶ 6). In June 2015, plaintiff promoted defendant "into the role of Partner." (Id. ¶ 7). "While

3

employed in an upper-level position with [plaintiff], [defendant] was principally engaged in the sourcing, evaluation, diligencing, negotiation, structuring, execution, and ongoing management of portfolio investments in the biopharmaceutical and life sciences sectors for certain private investment funds managed by [plaintiff], and he directly oversaw teams of investment professionals working on such transactions." (Id. ¶ 8). Defendant also "served on the board of one of [plaintiff's] portfolio companies located in the Netherlands." (Id. ¶ 9).

On June 24, 2015, in respect of his promotion to partner, defendant entered into the employment agreement with plaintiff. Under the employment agreement, plaintiff initially paid defendant an annual salary of $250,000, subsequently increased to $500,000 in July 2019, after a series of intervening raises. Defendant also received an annual bonus targeted each year at an amount equal to his annual salary, as well as a number of employee benefits. Plaintiff paid defendant a total of approximately $4,657,665 in compensation in the five years after his execution of the employment agreement.

Sections 6.1 and 6.2 of the employment agreement contain provisions regarding and intended to safeguard plaintiff's trade secrets, confidential information, and company property. Section 6.3 of the employment agreement includes the following non-competition provision:

**6.3    Competitive Business Activities.**  During the term of this Agreement, and Executive's employment by the Company thereunder, and the one (1) year period following the effective termination date (regardless of the reason for the termination and regardless of whether initiated by Executive or Company), Executive will not engage in the following activities:

      (a)    on Executive's own or another's behalf, whether as an officer, manager, member, director, stockholder, partner, associate, owner, employee, consultant or otherwise, directly or indirectly:

            (i)    compete with the Company or any Restricted Affiliate in the Company Business within the geographical areas set forth in Section 6.3.1, except that Executive, without violating this provision, may become employed by any company which is engaged in the integrated development, discovery, manufacture, marketing and sale of pharmaceutical drugs that does not engage in significant contract sales and/or contract research;

(DE 17-1 at 9).  The capitalized term "Company Business" is defined as follows:

> "Company Business" means the provision of investment advice and management services to a Fund and to related funds, and may include Successor Funds, among others, which advice and services include, among other things, the development of financial, business and scientific analysis, the solicitation of capital from select investors around the world, and decisions about and the investment of such capital in the world-wide life sciences and biopharmaceutical industries, including without limitation in the research, development and commercialization of life science and biopharmaceutical products and services through the use of a variety of financial arrangements.

(Id. at 18-19) (emphasis added).  The emphasized term "Fund" is defined as follows:

> "Fund" means Fund III, Fund IV (as defined in the LLC Agreement) and any Successor Fund. For the avoidance of doubt, PharmaBio shall not be considered a Fund for purposes of this Agreement.

(Id. at 19).  The emphasized term "LLC Agreement" is defined as follows:

> "LLC Agreement" means the Second Amended and Restated Limited Liability Company Agreement of NovaQuest Capital Management, L.L.C., dated June 24, 2015, as may be amended from time to time.

(Id. at 20).[3]

---

[3]    The LLC Agreement is not in the record.

Plaintiff terminated defendant May 27, 2020. In early June 2020, the parties began to negotiate the terms of a separation agreement providing for various separation payments and benefits. On June 19, 2020, the parties entered into the separation agreement, which reaffirms the terms of the covenant in the employment agreement. (See, e.g., separation agreement (DE 17-2) § 11(a)). In addition, the separation agreement provides for payment to defendant of over $1,000,000.00, representing one year of salary, bonus, and employee benefits, as consideration for defendant's promises and agreements in the separation agreement. To date, plaintiff has paid defendant $177,198 in separation pay and benefits pursuant to the terms of the separation agreement.

In August 2020, defendant moved his family from their home in Raleigh, North Carolina, to California, where defendant intends to remain permanently. In September 2020, defendant began working as a managing director for HealthCare, which is an investment firm that focuses on investments in life sciences companies. In particular:

> [HealthCare] is focused on providing non-dilutive, structured financing solutions to late stage and commercial-stage life sciences companies. As an alternative or complement to an equity issuance, [its] funding allows a company to eliminate or delay dilution while enabling the company to fund product launches, acquire or license products, or re-invest capital in earlier-stage R&D projects.

(Comer Decl., Ex. D. (DE 17-4) at 2-3).

HealthCare and plaintiff compete in some but not all aspects of their respective businesses. HealthCare generally focuses on "commercial stage" or "near commercial" stage life sciences companies. (Id.; Def's Decl. (DE 23-1) ¶ 12). "Without cooperation with [plaintiff], [HealthCare] cannot pursue opportunities to finance programs that are in early stages of development." (Def's Decl. (DE 23-1) ¶ 10). By contrast, plaintiff generally focuses on products that are in "development stage," particularly in that component of plaintiff's business in which defendant worked. (Id. ¶ 12).

6

There are exceptions. For example, "[t]here is a single transaction in all of the product-based financings in [plaintiff's] active portfolio that was closed where the underlying asset was commercial." (Id.). "All other transactions, more than 20 in total, have been early stage (pre-approval). (Id.). "[HealthCare] over this same period has made dozens of investments in commercial stage royalties and zero investments into early stage product base investments of the type in which [plaintiff] invests." (Id.).

"There may have been one or two rare situations in which [HealthCare] and [plaintiff] both sought the same investment opportunity, but those situations ended up with [HealthCare] and [plaintiff] cooperating by carving out the commercial portion (going to [HealthCare]) and early stage financing (going to [plaintiff])." (Id. ¶ 14). Plaintiff and HealthCare "typically are not bidding for deals as part of a banker-led process." (Id.).

Defendant's current job role at HealthCare "is to source and structure royalty interest and/or debt securities in commercial stage biopharma assets with companies or royalty originators on the West Coast." (Id. ¶ 16). By contrast, defendant's role while working with plaintiff "was much broader in that [he] focused on . . . United States activities," and "spent the vast majority of [his] time (>90%) sourcing and structuring investments on pre-revenue (early-stage) programs where underlying securities used are not classified as royalty and/or debt securities." (Id.).

"While employed [with plaintiff], [defendant] actively worked with representatives of [HealthCare] in respect of potential transactions on which [plaintiff] and [HealthCare] proposed to partner." (Comer Decl. (DE 17) ¶ 38). Defendant also "worked opposite representatives of [HealthCare] on transactions for which [plaintiff] and [HealthCare] were offering competing financing solutions." (Id. ¶ 39). "[P]romptly after [defendant's] employment with [plaintiff] ended, John Urquhart, a Partner at [HealthCare] . . . contacted [plaintiff] to propose that the two

7

companies enter into a 50/50 partnership with respect to a significant potential structured finance investment opportunity with a late development stage life sciences company for the development of a pharmaceutical asset." (Id. ¶ 40). "[Plaintiff] led the due diligence efforts and provided all materials to [HealthCare], including participation on calls with external consultants." (Def's Decl. (DE 23-1) ¶ 10). Plaintiff and HealthCare "interacted on the structural efforts and shared all materials." (Id.). However, defendant "recused [him]self from these discussions given [plaintiff's] lawsuit against [him]." (Id.). Further, HealthCare decided not to cooperate with plaintiff on this opportunity due to the instant lawsuit. (Id.).

Defendant has taken the position that he is not restricted in any respect by the covenant in his work at HealthCare, or any other company. Thus, absent an injunction enforcing the terms of the covenant, defendant likely will use the years of experience, knowledge, processes, and industry relationships he developed while working with plaintiff to pursue investments for HealthCare in some of the same stages of funding, such as late stage or pre-commercial funding. (See, e.g., Def's Decl. (DE 23-1) ¶¶ 3, 12, 16). Without any injunction, defendant likely would expand HealthCare's focus, or develop opportunities with any other company, into earlier stages of funding, to take advantage of his substantial experience in providing plaintiff services in the development stages of funding. (See, e.g., DE 17-4 at 2; Comer Decl. (DE 17) ¶¶ 38-40; Comer Reply Decl. (DE 26) ¶ 8; Def's Decl. (DE 23-1) ¶¶ 11, 16).

Defendant's use of his experience, knowledge, processes, and industry relationships he developed while working with plaintiff while at HealthCare would facilitate a HealthCare business line competing directly with plaintiff's funds, and would put plaintiff at a significant competitive disadvantage in pursuing attractive investment opportunities. (Comer Decl. (DE 17) ¶¶ 45-46).

A.      Standard of Review

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Id. at 22; see Real Truth About Obama Inc. v. Fed. Election Comm'n, 575 F.3d 342, 347 (4th Cir.2009) (stating that a plaintiff seeking a preliminary injunction must "make a clear showing" of likelihood of success and irreparable harm) (citing Winter, 555 U.S. at 20), vacated on other grounds, 130 S. Ct. 2371 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

"The rationale behind a grant of a preliminary injunction has been explained as preserving the status quo so that a court can render a meaningful decision after a trial on the merits." Hazardous Waste Treatment Council v. South Carolina, 945 F.2d 781, 788 (4th Cir. 1991) (quotations omitted). Accordingly, "[m]andatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." Taylor v. Freeman, 34 F.3d 266, 270 n. 2 (4th Cir. 1994); see E. Tenn. Nat. Gas Co. v. Sage, 361 F.3d 808, 828 (4th Cir.2004); Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir.1980).

With respect to findings of fact and conclusions of law, a preliminary injunction is decided "on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981). "A party thus is not required to prove his case in full at a preliminary-injunction hearing," and the findings of fact and

conclusions of law made by a court in ruling on a preliminary injunction are not binding at trial on the merits. See id.

B.     Analysis

1.     Likelihood of Success on the Merits

Plaintiff has demonstrated a likelihood of success on the merits of part of its breach of contract claim based upon the covenant. Under North Carolina law, the "elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Crosby v. City of Gastonia, 635 F.3d 634, 645 (4th Cir.2011) (quotations omitted). The court addresses each of these elements in turn below.

a.     Validity of Covenant

"Covenants not to compete are disfavored in North Carolina."[4] RLM Commc'ns, Inc. v. Tuschen, 831 F.3d 190, 196 (4th Cir. 2016). "They are valid only if they are (1) in writing; (2) made a part of the employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest of the employer." Id. (quotations omitted).

Here, the covenant meets the requirements for validity. It is part of the written employment agreement and based on valuable consideration, including continued employment and compensation. It is reasonable as to time, because it restricts defendant's activities for only one year after separation. It is also designed to protect a legitimate business interest of the employer, where it is narrowly tailored to protect against competition with plaintiff in the "Company Business," and where it expressly recites the harm flowing from such competition. (DE 17-1 at 9,

_____

[4]     The employment agreement and separation agreement expressly state that they are governed by North Carolina law.

11)  In addition, here, as in other cases upholding the validity of a covenant not to compete, "the nature of the employment is such as will bring the employee in personal contact with patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers."  United Labs., Inc. v. Kuykendall, 322 N.C. 643, 650 (1988) (quotations omitted).  In such context, a covenant not to engage "in a competing business in [the defendant's] own behalf, or for another, to take advantage of such knowledge of or acquaintance with the patrons and customers of his former employer, and thereby gain an unfair advantage," will be enforced.  Id.

Defendant challenges the geographic scope of the covenant, requiring a closer analysis of this issue.  With respect to territory, the covenant provides that defendant:

> agrees that the activities prohibited by this Section 6.3 are appropriately prohibited on a world-wide basis. Accordingly, the largest enforceable geographic territory defined below shall apply:
>
> (i) any city in which the Company is located or does or, during the term of this Agreement, and the employment relationship hereunder, did business;
>
> (ii) any county in which the Company is located or does or, during the term of this Agreement, and the employment relationship hereunder, did business;
>
> (iii) any state in which the Company is located or does or, during the term of this Agreement, and the employment relationship hereunder, did business;
>
> (iv) the United States of America;
>
> (v) any country in which the Company is located or does or, during the term of this Agreement, and the employment relationship hereunder, did business;
>
> (vi) [-(ix)] any city [county, state, or country] in which Executive's substantial duties were performed, or for which Executive had substantial responsibility, or in which Executive worked on Company projects, during the term of this Agreement, and the employment relationship hereunder, including, without limitation, the locations set forth on Appendix B attached hereto; [5]

---

[5]     In the employment agreement in the record, Appendix B states only "Not applicable." (DE 17-1 at 22). Therefore the court does not consider relevant to the instant analysis subsections (vi) to (ix).

11

(x) world-wide.

(DE 17-1 at 10). To be reasonable, territory restrictions in a covenant must be "no broader than necessary to protect the employer's legitimate interests." Am. Hot Rod Ass'n, Inc. v. Carrier, 500 F.2d 1269, 1278 (4th Cir. 1974). For example, "to a company actually engaged in nation-wide activities, nation-wide protection would appear to be reasonable and proper." Harwell Enterprises, Inc. v. Heim, 276 N.C. 475, 481 (1970).

In this case, plaintiff has not made a clear showing of likelihood of success enforcing the covenant on a world-wide territory against defendant. Nevertheless, "a court may choose not to enforce a distinctly separable part of a covenant in order to render the provision reasonable." RLM Commc'ns, Inc., 831 F.3d at 197 (quotations omitted). Here, the covenant expressly provides alternative geographic territories, including a nationwide territorial scope, each of which is distinctly separable from the other. (DE 17-1 at 10). Contrary to defendant's argument, no impermissible rewriting of the covenant is required, cf. Whittaker Gen. Med. Corp. v. Daniel, 324 N.C. 523, 528 (1989), where the covenant expressly allows for distinctly separable and alternative territorial scopes.

A nationwide territorial scope is reasonable based on the present record and aligns with defendant's own statement that when he worked with plaintiff he "focused on primarily United States activities." (Def's Decl. (DE 23-1) ¶ 16). The court recognizes the statement by Comer that plaintiff "operates in a highly competitive global marketplace and has evaluated and/or engaged in transactions in furtherance of its business in California, Massachusetts, New York, New Jersey, North Carolina, the United Kingdom, France, Germany, Switzerland, Italy, the Netherlands, Spain, Japan, Korea, China, India, and Australia, among other locations." (Comer Decl. (DE 17) ¶ 5). The emphasized statement, however, is too vague to establish plaintiff

12

"actually engaged in . . . activities," in the enumerated locations, much less world-wide. Harwell, 276 N.C. at 481.[6]

In sum, plaintiff has demonstrated a likelihood of success on the issue of validity of the covenant for enforcement in the United States. The court addresses further below additional issues regarding the territorial scope of the preliminary injunction sought.

   b. Breach of Covenant

The instant motion raises two overarching issues regarding whether there has been a breach of the terms of the covenant. The first issue concerns the proper interpretation of the terms of the covenant. The second issue concerns whether defendant has breached those terms as so interpreted. The court addresses each issue in turn below.

   i. Contract Interpretation

 "Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Phillip Morris USA Inc., 363 N.C. 623, 631 (2009) (internal citation and quotation omitted). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners," by "using the plain meaning of the written terms." Ussery v. Branch Banking & Tr. Co., 368 N.C. 325, 336 (2015) (quotations omitted).

"In interpreting contracts, we construe them as a whole." Id. at 335. "Each clause and word is considered with reference to each other and is given effect by reasonable construction." Christenbury Eye Ctr., P.A. v. Medflow, Inc., 370 N.C. 1, 7 (2017). "All parts of a contract are to be given effect if possible. It is presumed that each part of the contract means something." Bolton

---

[6] Similarly, where there is a dispute of fact as to defendant's role in a transaction involving board activity in the Netherlands, (cf. Def's Decl. (DE 23-1) ¶ 17 and Comey Decl. (DE 17) ¶ 9), the court declines at this juncture to impose a world-wide scope on the covenant on this basis.

Corp. v. T.A. Loving Co., 317 N.C. 623, 628 (1986). "The various terms of the [contract] are to be harmoniously construed." Singleton v. Haywood Elec. Membership Corp., 357 N.C. 623, 629, (2003).

Here, the key prohibition in the covenant is that defendant must not "compete with the Company . . . in the Company Business," (DE 17-1 at 9), where the term "Company Business" is defined to mean:

> the provision of investment advice and management services to a Fund and to related funds, and may include Successor Funds, among others, which advice and services include, among other things, the development of financial, business and scientific analysis, the solicitation of capital from select investors around the world, and decisions about and the investment of such capital in the world-wide life sciences and biopharmaceutical industries, including without limitation in the research, development and commercialization of life science and biopharmaceutical products and services through the use of a variety of financial arrangements.

(Id. at 18-19) (emphasis added).

The parties dispute the interpretation of the phrase "compete with the Company . . . in the Company Business," (DE 17-1 at 9), as it is used in the covenant. Defendant argues that the phrase is limited to mean only provision of advice and management services to an internal "Fund" of plaintiff, for example "Fund II, Fund IV, as defined in the LLC Agreement and any Successor Fund." (DE 17-1 at 19). Plaintiff claims, by contrast, that the phrase is broader and includes working for another company engaged in the same kind of business as the Company Business.

Plaintiff has demonstrated a likelihood of success in ruling out defendant's proposed interpretation as a matter of law. Defendant's proposed interpretation of the covenant is too narrow and contrary to the terms of the employment agreement for several reasons. First, the covenant provides on its face that defendant shall not "compete with" plaintiff in the Company Business, (id. at 9), which by its plain language means to be in a state of rivalry with plaintiff or to establish superiority over plaintiff while doing the same activity. Accordingly, is not reasonable to construe

the covenant as limited only to prohibiting defendant from providing "investment advice and management services," (id. at 18), a collaborative and cooperative activity, to plaintiff's own internal funds, while allowing defendant freely to provide the same or similar advice to any other companies.

Second, and alternatively, "Company Business" is defined to include provision of advice to a "Fund" (defined with reference to plaintiff's LLC agreement) and to "related funds" (an undefined term), meaning that "Company Business" includes not only plaintiff's own funds but other funds of others tied to related, or similar, investments. (Id. at 18-19). Here, while defendant suggests that HealthCare is not itself a "Fund," (Def's Mem. (DE 23) at 2), defendant does concede that HealthCare has more than one "fund" which it operates, just as plaintiff has more than one "fund" that it operates. (Def's Decl. (DE 23-1) ¶ 12).

Third, interpreting the covenant in the manner defendant urges would render certain provisions of the covenant superfluous. In particular, the covenant provides an exception allowing defendant to "become employed by any company which is engaged in the integrated development, discovery, manufacture, marketing and sale of pharmaceutical drugs that does not engage in significant contract sales and/or contract research." (DE 17-1 at 9). If the covenant restricted defendant only in providing investment advice to plaintiff's own funds, and did not impose any restriction on his provision of advice to other companies, then it would be redundant to include this exception in the covenant.

Defendant suggests that it would make economic sense for plaintiff to bargain for and restrict defendant from providing advice to plaintiff's own Funds, thus supporting his proposed interpretation of the covenant. According to defendant, "[i]t is quite possible for the Limited Partners in a fund to remove the General Partner and hire a replacement General Partner to provide

15

investment advice and management services." (Def's Mem. (DE 23) at 18). Defendant further asserts "[i]t appears [plaintiff] intended to prohibit [defendant] from soliciting its Limited Partners to remove the General Partner and replace it with [defendant], or a group he controls." (Id.). Defendant's suggestion is unavailing on the issue of interpretation of the covenant. As an initial matter, the terms of the employment agreement and the separation agreement do not reflect that this was plaintiff's intention in agreeing to the covenant. Second, defendant's suggestion of a hypothetical scenario under which the covenant, as he interprets it, could become useful to the company, is speculative. Such a scenario "is a very rare event in the industry and has never once happened in [plaintiff's] history." (Comer Reply Decl. (DE 26) ¶ 4). In any event, it is beside the point that plaintiff could have gained some benefit from a limited covenant construed to apply only to internal Fund activities, where plaintiff would gain a much clearer and greater benefit from a covenant construed as set forth herein.

In sum, plaintiff has demonstrated a likelihood of success in ruling out defendant's proposed interpretation as a matter of law. At the same time, however, plaintiff has not demonstrated a likelihood of success in all aspects of its own proposed interpretation of the covenant. In particular, plaintiff asserts that the covenant prohibits defendant "from working for other companies engaged in that same kind of business as the Company Business." (Reply (DE 25) at 2; see also Mot. for Prelim. Inj. (DE 15) at 2 (seeking to enjoin defendant from being "employed by" HealthCare). The covenant does not contain such an unequivocal, broad, restriction. The court instead construes the covenant for purposes of the instant motion, with reference to its plain language, to prohibit defendant from providing investment advice and management services to any investment fund, similar to or related to plaintiff's funds, in the life sciences and biopharmaceutical industries.

16

Contrary to plaintiff's suggestion, the covenant does not necessarily impose a company-wide restriction, or a restriction focused on an entire company, but rather imposes a restriction on the defendant's own individual "provision of investment advice and management services." (DE 17-1 at 18). Thus, the covenant, as presently construed, restricts defendant's provision of certain services, but does not in itself prohibit entirely an entity that may compete with plaintiff, such as HealthCare, from employing defendant. In this respect, as set forth further herein, plaintiff has demonstrated a likelihood of success on only part of its claim, and the court will limit the corresponding scope of any preliminary injunction imposed.

ii. Breach

Plaintiff has demonstrated a likelihood of success on part of its claim that defendant breached the covenant, construed in accordance with the court's foregoing interpretation. In particular, defendant likely has breached the covenant by providing investment advice and management services on behalf of HealthCare, in those instances where HealthCare has considered or pursued investment opportunities to fund products in the life sciences and biopharmaceutical industries, in a pre-commercial stage. There is, by contrast, a substantial ground for disputing that defendant has breached the covenant by providing investment advice and management services on behalf of HealthCare, to fund commercial stage products.

The evidence supporting this determination at this early juncture of the case is as follows.

First with respect to defendant's pre-commercial stage activities, defendant "is focused primarily on [HealthCare's] activities on the West Coast, including transaction sourcing and structuring," (DE 17-3 at 2), and HealthCare, in turn, is "focused on providing non-dilutive, structured financing solutions to late stage and commercial stage life sciences companies." (DE 17-4 at 2) (emphasis added). According to defendant, HealthCare "is restricted from products that

17

are in development stage" and instead focuses on products that are "<u>near commercial</u>" or in commercial stages. (Def's Decl. (DE 23-1) ¶ 12) (emphasis added).

Second, according to defendant, plaintiff "focuses on products that are in a <u>development stage</u>," or "R&D stage," or "early stage (pre-approval)," and it is restricted from products that are in commercial stage." (Def's Decl. (DE 23-1) ¶ 12). According to plaintiff, by contrast, it focuses on "<u>late development stage</u> and commercial stage life sciences companies." (Comer Decl. (DE 17) ¶ 36; Comer Reply Decl. ¶ 5) (emphasis added). Plaintiff also will pursue financing "products in clinical development." (Comer Reply Decl. (DE 26) ¶ 5). Taking these mixed statements together, while there is much dispute over the degree of overlap at the margins of product stages, there is no dispute that both HealthCare and plaintiff consider or pursue some pre-commercial stage investments, whether those are "late stage" or "near commercial." It is thus at the intersection of "late stage" or "near commercial" investments that a breach likely has occurred.

The court's determination that there are some limited stages of products in which the services of plaintiff and HealthCare overlap is supported additionally by the fact that "promptly after [defendant's] employment with [plaintiff] ended, John Urquhart, a Partner at [HealthCare] . . . contacted [plaintiff] to propose that the two companies enter into a 50/50 partnership with respect to a significant potential structured finance investment opportunity with <u>a late development stage</u> life sciences company for the development of a pharmaceutical asset." (Comer Decl. (DE 17) ¶ 40) (emphasis added). While defendant describes this as a "cooperative, not competitive" opportunity, (Def's Decl. (DE 23-1) ¶ 10), that description is beside the point that the two companies were considering an opportunity in the same stage. Likewise, while defendant asserts that he recused himself from the particular transaction due to the instant lawsuit, it is nonetheless

an example that supports a determination of likelihood of success on the merits of at least a portion of plaintiff's breach of contract claim.

Furthermore, though not in itself establishing an actual breach, the court credits plaintiff's assertion that some discovery documents "refer explicitly to the contemplation by [HealthCare] of a <u>product development stage fund</u> . . . in which [defendant] would receive a carry interest, a profit interest, and the potential to be a partner." (Comer Reply Decl. (DE 26) ¶ 8) (emphasis added). Although defendant states that "a product-based investment" is "something that [HealthCare] doesn't do," and HealthCare is "restricted from products that are in development stage," (Def's Decl. (DE 23-1) ¶¶ 10, 12), plaintiff's evidence from discovery nonetheless supports a determination of a clear overlap in certain areas of potential business of plaintiff and defendant.[7]

Moreover, "[w]hile employed [with plaintiff], [defendant] actively worked with representatives of [HealthCare] in respect of potential transactions on which [plaintiff] and [HealthCare] proposed to partner." (Comer Decl. (DE 17) ¶ 38). Defendant also "worked opposite representatives of [HealthCare] on transactions for which [plaintiff] and [HealthCare] were offering competing financing solutions." (<u>Id.</u> ¶ 39).

At the other end of the spectrum, although defendant concedes one exceptional instance where plaintiff engaged in a commercial stage financing, (<u>see</u> Def's Decl. (DE 23-1) ¶ 12), the court finds that this exception alone does not establish a likelihood of success in asserting a claim for breach based upon HealthCare's commercial stage financing activities, particularly where there

---

[7]     Additional corroboration of an overlap in the business of plaintiff and defendant, though not in itself establishing a breach, is in the instance of contact from Ted Breck, of J. Wood Capital Advisors LLC, contacting plaintiff after he moved to California, to "brief" defendant on an opportunity involving advise to "an emerging biopharma company." (Def's Decl. (DE 23-1) ¶ 11). Though defendant denies any further involvement in this opportunity, it is nonetheless relevant to likelihood of success in this part of plaintiff's claim.

19

is no evidence of defendant's individual involvement with commercial stage financing while working for plaintiff.[8]

In sum, a clear breach is established through defendant's activities in the areas of "late stage" and "near commercial" stage investment, and defendant has demonstrated a likelihood of success on this part of its claim. A clear breach also would be established if defendant in fact engaged in any other pre-commercial stage activities, including any earlier product development stages. By contrast, there is a substantial dispute of fact over the extent of defendant's activities for plaintiff in the area of commercial stage investment. Although the court will not preliminarily enjoin defendant's activities in the area of commercial stage investment, defendant still may risk liability at a later phase of litigation, in the event of a determination that plaintiff in fact directed funds to that stage of development during the term of the covenant.

2.      Likelihood of Irreparable Harm

"Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is <u>likely</u> in the absence of an injunction." <u>Winter</u>, 555 U.S. at 22. "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." <u>Id.</u>

"Generally, irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." <u>Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.</u>,

---

[8]      Defendant states that the "vast majority" (>90%) of his time while working for plaintiff was spent on "pre-revenue (early-stage) programs," implying that the remainder was spent on either late stage or commercial stage programs. (Def's Decl. (DE 23-1) ¶ 16). At this juncture, drawing inferences in defendant's favor as non-movant, this permits an inference that defendant spent some time on late stage programs, but not necessarily commercial stage programs. For this reason, also, the court does not find determinative the reference in plaintiff's "Private Placement Memorandum" plaintiff's planned pursuit of funding of products "in clinical development and commercial stages." (Comer Reply Decl. (DE 26) ¶ 5).

22 F.3d 546, 551 (4th Cir. 1994). For example, "when the failure to grant preliminary relief" likely will lead to "permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." Id.

Plaintiff has established a likelihood of irreparable harm in the absence of a preliminary injunction on the terms set forth herein. In particular, defendant has taken the position that he is not restricted in any respect by the covenant in his work at HealthCare, or any other company. (See, e.g., Def's Mem. (DE 23) at 16-19). Thus, absent any injunction enforcing the terms of the covenant as construed herein, defendant likely will use the years of experience, knowledge, processes, and industry relationships he developed while working with plaintiff to pursue investments for HealthCare in some of the same stages of funding, such as late stage or pre-commercial funding. (See, e.g., Def's Decl. (DE 23-1) ¶¶ 3, 12, 16). Without any injunction, defendant likely would expand HealthCare's focus, or develop opportunities with any other company, into earlier stages of funding, to take advantage of his substantial experience in providing plaintiff services in the development stages of funding, as demonstrated by the evidence discussed above bearing on plaintiff's claim for breach of contract. (See, e.g., DE 17-4 at 2; Comer Decl. (DE 17) ¶¶ 38-40; Comer Reply Decl. (DE 26) ¶ 8; Def's Decl. (DE 23-1) ¶¶ 11, 16).

In this case, monetary damages are difficult to ascertain because of the likelihood of an expansion, absent an injunction, by HealthCare into new areas of pre-commercial funding in competition with plaintiff. Defendant's use of his experience, knowledge, processes, and industry relationships he developed while working with plaintiff while at HealthCare would facilitate a HealthCare business line competing directly with plaintiff's funds, and would put plaintiff at a significant competitive disadvantage in pursuing attractive investment opportunities. The harm to plaintiff of lost transactions from competitive pricing pressures, and from the introduction of a

dedicated, directly competitive business line that did not otherwise exist at HealthCare but for the hiring of defendant, is both difficult to quantify and the result of loss of customers to competition.

Defendant cites Southtech Orthopedics, Inc. v. Dingus, 428 F. Supp. 2d 410, 418 (E.D.N.C. 2006) for the proposition that "it is axiomatic that purely economic injury, such as that resulting from lost sales, profits or market share, does not constitute irreparable harm sufficient to warrant injunctive relief." At the same time, however, the court recognized, as here, that "the possibility of permanent loss of customers to a competitor or the loss of goodwill will constitute irreparable harm where the damages are intangible and thus impossible to ascertain," citing Multi–Channel TV Cable Co., 22 F.3d at 551. In any event, Southtech is distinguishable in light of the nature of the products and sales in that case, as well as the unqualified determination by the court there that the relevant corporate entities "are not directly competing with each other to sell the same product." 428 F.Supp.2d at 419. "Rather, each has the exclusive right to sell certain manufacturers' products in a given territory." Id. [9]

Defendant also suggests that there is no evidence that he misappropriated any trade secrets or has used specific confidential information in his work for HealthCare. The court's injunction as imposed herein, does not rely upon a finding of misappropriation of trade secrets or use of confidential information. The evidence does not reflect that defendant took with him to HealthCare any physical or electronic assets containing trade secrets or confidential information. Instead, the court relies upon the potential for irreparable competitive injury to plaintiff if defendant is

---

[9] Additional factors distinguish the instant case from Southtech Orthopedics, including the harm to the defendant there if an injunction was granted, including that "he will be unemployed" and the "loss of the business expectancies created by [a] distributorship agreement," which harms are not at issue in the instant case, for reasons discussed further below. 428 F.Supp.2d at 420. Moreover, the defendant in that case delayed a significant time between discovery of competitive activities and filing of suit. Id. Furthermore, the plaintiff failed to demonstrate a likelihood of success on the merits, inter alia, because the covenant in that case may be facially overbroad in that it could be construed as prohibiting defendant from being employed in a host of non-competitive capacities, such as a custodian." Id. at 421. The covenant in the instant case, as here interpreted, is narrowly focused on the type of defendant's activities and not a company-wide ban on employment.

permitted to continue his work unchecked by the plain terms of the covenant not to compete, in light of defendant's knowledge, processes, and industry relationships he developed while working with plaintiff to pursue investments for HealthCare in some of the same stages of funding, such as late stage or pre-commercial funding.

In sum, given defendant's extensive years of experience with plaintiff, working almost entirely in pre-commercial funding opportunities, where that is an area of significant growth potential for HealthCare, plaintiff has demonstrated a likelihood of irreparable harm if an injunction on the terms set forth herein is not imposed.

3.      Balance of Equities and Public Interest

Here, the balance of equities and public interest tips in favor of the limited injunction imposed by this order, because of the lack of demonstrated irreparable harm to defendant if the injunction is imposed on the terms set forth herein.  In particular, the present injunction restrains defendant from activities in a pre-commercial stage, including a "development stage" that defendant contends is largely the focus of plaintiff's activities, and largely off-limits to HealthCare. (See Def's Decl. (DE 23-1) ¶12).  With respect to overlapping categories of plaintiff's activities and defendant's activities that are included within the scope of the injunction, such as "near commercial" and "late stage,"  (Comer Decl., Ex. D. (DE 17-4) at 2-3; Def's Decl. (DE 23-1) ¶ 12), defendant has not demonstrated that a restriction from such activities will harm defendant's position or compensation with HealthCare during the time that the injunction is in effect.

In addition, where the court does not adopt all components of plaintiff's proposed injunction, the court's injunction does not result in the potential harm of which defendant complains in response to plaintiff's motion.  In particular, defendant claims that plaintiff's proposed injunction is an "overly broad restriction against any employment with [HealthCare]."

(Def's Mem. (DE 23) at 29). Defendant also argues that "[i]njunctive relief prohibiting [defendant] from working for [HealthCare] would violate public policy." (Id.). The court agrees with that assessment, and accordingly does not impose such an overly broad restriction here. Instead, as set forth in the following discussion regarding the scope of the injunction, the court has imposed a preliminary injunction consistent with the terms of the covenant and tailored as precisely as possible to exact needs of the case.

Therefore, the balance of equities and public policy weigh in favor of imposition of the instant preliminary injunction.

4. Scope of Preliminary Injunction

"Injunctions must be narrowly tailored and should prohibit only unlawful conduct." CPC Int'l, Inc. v. Skippy Inc., 214 F.3d 456, 461 (4th Cir. 2000). An injunctive "order must be tailored as precisely as possible to the exact needs of the case." Id. (quotations omitted); see, e.g., Nat'l Audubon Soc'y v. Dep't of Navy, 422 F.3d 174, 181 (4th Cir. 2005) (stating "the injunction issued by the district court was overly broad" and remanding "with instructions to narrow the injunction"). "Absent this narrowing, . . . [an] injunction[] will not survive appellate review." Cromer v. Kraft Foods N. Am., Inc., 390 F.3d 812, 818 (4th Cir. 2004). In addition, "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." Pashby v. Delia, 709 F.3d 307, 331 (4th Cir. 2013).

Here, based upon the court's analysis in the preceding sections of this order, the preliminary injunction sought by plaintiff is both overly broad and insufficiently precise. The injunction sought contains two components that are overly broad.

First, plaintiff seeks an injunction, in part, that enjoins defendant from being "employed by" HealthCare, through the expiration of the litigation. (DE 15 at 2). Per the court's analysis of

likelihood of success on the merits, the covenant cannot sweep this broadly. Moreover, to impose a requirement that defendant terminate his present employment with HealthCare would amount to a mandatory injunction, altering the status quo, which is "disfavored, and warranted only in the most extraordinary circumstances," not demonstrate here. Taylor, 34 F.3d at 270 n. 2 (4th Cir. 1994). By contrast, the injunction imposed by this order seeks to maintain as precisely as possible the status quo by enforcing the plain terms of the covenant and by hewing closely to what defendant contends he is already refraining from doing in his current position.

Second, plaintiff seeks an injunction, in part, that enjoins defendant from "disclosing or using any of [plaintiff's] Trade Secrets or Confidential Information to further his own business interests or the business interests" of others. (Pl's Mot. (DE 15) at 2-3). Plaintiff, however, does not assert a claim for wrongful disclosure or use of trade secrets or confidential information. (See, e.g., Compl. ¶¶ 59-66). In any event, to the extent the complaint and motion suggests an assertion of such wrongful disclosure or use, plaintiff has not demonstrated a clear likelihood of success of such a claim. The covenant validly prohibits any such wrongful disclosure or use (DE 17-1 at 7-8), and defendant could still be subject to liability for such conduct. However, plaintiff has not demonstrated a need for a preliminary injunction containing this additional restriction.

In addition, the remaining portion of plaintiff's proposed preliminary injunction is insufficiently precise. Plaintiff requests a preliminary injunction enjoining defendant "from violating his contractual obligations owing to [plaintiff] in the [c]ovenant." (DE 15 at 2). Based on the court's analysis herein, more precision identifying prohibited activities is required. In particular, defendant shall be enjoined until May 27, 2021,[10] from:

---

[10]    The court recognizes that the covenant contains a tolling period that extends the term of the restrictions in the covenant "during any period in which he fails to abide by these provisions." (DE 17-1 at 11). The court finds nonetheless that a time-limited term for the court's preliminary injunction tied to the un-tolled period of the covenant, one year after defendant's termination, is more reasonable and commensurate with the court's analysis herein than an

providing investment advice and management services to any fund, including any HealthCare fund that is directed to life science and biopharmaceutical products and services in a pre-commercial stage, including development stages, near commercial stages, or late development stages, which advice and services include, among other things, the development of financial, business and scientific analysis, the solicitation of capital from select investors around the United States, and decisions about and the investment of such capital in the United States life sciences and biopharmaceutical industries, including without limitation in the research, development and any pre-commercial stages of life science and biopharmaceutical products and services through the use of a variety of financial arrangements.

Finally, in analyzing the scope and terms of the injunction, the court takes into account the propriety of a bond as a condition for the preliminary injunction. A "district court retains the discretion to set the bond amount as it sees fit or waive the security requirement." Pashby, 709 F.3d at 332. Here, given the limited scope of the injunction imposed, the lack of identified harm to defendant, and the lack of any evidence that plaintiff will be unable to compensate defendant in the event defendant prevails at the conclusion of the litigation, the court waives the bond requirement.

## CONCLUSION

Based on the foregoing, plaintiff's motion for preliminary injunction (DE 15) is GRANTED IN PART and DENIED IN PART as set forth herein. In particular, defendant is enjoined until May 27, 2021, from:

providing investment advice and management services to any fund, including any HealthCare fund that is directed to life science and biopharmaceutical products and services in a pre-commercial stage, including development stages, near commercial stages, or late development stages, which advice and services include, among other things, the development of financial, business and scientific analysis, the solicitation of capital from select investors around the United States, and decisions about and the investment of such capital in the United States life sciences and

---

open-ended term tied to an unspecified and uncertain date of termination of litigation. Such term limitation is without prejudice to a modification of the injunction at an appropriate time, upon good cause shown. See Dombrowski v. Pfister, 380 U.S. 479, 492 (1965) ("[D]istrict courts retain power to modify injunctions in light of changed circumstances.").

biopharmaceutical industries, including without limitation in the research, development and any pre-commercial stages of life science and biopharmaceutical products and services through the use of a variety of financial arrangements.

In accordance with the court's October 22, 2020, order, defendant is DIRECTED to file an answer to the complaint within seven days from the date of this order.

SO ORDERED, this the 30th day of October, 2020.

LOUISE W. FLANAGAN
United States District Judge